# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
**No. 24-546V**

| | | |
|---|---|---|
| TRACI WEISS, *on behalf of her minor child, A.W.*, | * | Chief Special Master Corcoran |
| Petitioner, | * | Filed: August 31, 2026 |
| v. | * | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | * | |
| Respondent. | * | |

*Christopher Williams*, Siri & Glimstad LLP, New York, NY, for Petitioner.

*Lynn Christina Schlie*, U.S. Department of Justice, Washington, DC, for Respondent.

## ENTITLEMENT DECISION[1]

On April 10, 2024, Traci Weiss filed this Petition on behalf of her minor child, A.W., seeking compensation under the National Vaccine Injury Compensation Program (the "Vaccine Program" or "Program").[2] Petition, dated Apr. 10, 2024 (ECF No. 1) ("Pet."). Petitioner alleges that "various vaccinations beginning 8/9/2021 through 1/3/2022" caused A.W. to develop vitiligo and Graves' disease,[3] or in the alternative "significantly aggravated an underling or pre-existing autoimmune issue." Pet. at 1, 11.

[1] Under Vaccine Rule 18(b), each party has fourteen (14) days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public in its present form. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3758, codified as amended at 42 U.S.C. §§ 300aa-10 through 34 (2012) ("Vaccine Act" or "the Act"). Individual section references hereafter will be to § 300aa of the Act (but will omit that statutory prefix).

[3] Graves' disease is an immune system condition that affects the thyroid gland, and causes the body to make too much thyroid hormone (hyperthyroidism). *See Graves disease,* Dorland's Medical Dictionary Online,

In May 2025, I ordered Petitioner to show cause why her claim should not be dismissed, since it appeared from the record that *no* medically-acceptable onset timeframe could be established (based on the fact that A.W.'s skin pigmentation issues either long predated vaccination, or could not be shown to have begun, or been worsened, in any reasonable post-vaccination timeframe). Order to Show Cause, dated June 2, 2025 (ECF No. 23) ("Order to Show Cause").

The parties have since briefed their respective positions. Petitioner's Brief, dated September 29, 2025 (ECF No. 32) ("Br."); Respondent's Brief, dated November 20, 2025 (ECF No. 33) ("Opp."); Petitioner's Reply, dated December 22, 2025 (ECF No. 53) ("Reply"). Now, I find that Petitioner has failed to establish that A.W.'s alleged injuries likely began in a medically acceptable timeframe from vaccination.

## I. Relevant Medical History

*Medical Records*

Between August 19 and 31, 2021, A.W. received the inactivated polio virus ("IPV"), oral polio virus ("OPV"), tetanus, diphtheria, and pertussis ("Tdap") Hepatitis B ("Hep B"), varicella, and first dose of measles, mumps, and rubella ("MMR") vaccines. Ex. 3 at 19–30. A.W. was ten years old at the time of her vaccinations. *Id.* at 49. Following each vaccination, A.W. reportedly experienced "[n]o complications." Ex. 2 at 19, 24, 28, 31.

A.W.'s pre-vaccination medical history included "white spot on face" as well as a family history of hyperimmune conditions; autoimmune diseases, such as Juvenile Rheumatoid Arthritis and Hashimoto's thyroiditis; and immune cancers. Ex. 3 at 4, 9–11. Ms. Weiss (A.W.'s mother), has a confirmed diagnosis of Hashimoto's thyroiditis, but A.W. did not carry such a diagnosis at the time she received these vaccinations. *Id.*

Over two months later, A.W. received her IPV, Hep B, OPV, and Tdap boosters between November 4 and 12, 2021. Ex. 3 at 36–44. A.W.'s heart rate was measured, and it did not exceed ninety-two beats per minute. *Id.* There are no other records relevant to this case for the period through the end of 2021.

*2022 Vaccinations*

---

https://www.dorlandsonline.com/dorland/definition?id=70364&searchterm=Graves%20disease (last visited Aug. 27, 2026).

A.W. went to the doctor on January 3, 2022, to receive her second dose of the MMR and varicella vaccines. Ex. 3 at 49. The administering doctor noted as of the time of vaccination "no palpitations, no lymphadenopathy (LAD), no thyromegaly, no masses." *Id.*

The next time the A.W. saw a medical provider was July 27, 2022—over *six months* after her last vaccinations in January, with no medical evidence of issues in this timeframe. Ex. 4 at 8. It was now reported that A.W. was experiencing right ear pain, and she was diagnosed with an impacted cerumen and was treated with suction to remove any blockage. *Id.* at 11. There was no mention of hypopigmentation, and the physician noted that A.W. was negative for skin conditions (rash, acne, dry skin). *Id.* at 8–12. No other medical concerns were reported at this time.

The following month (August 2, 2022), A.W. was seen by Dr. Sheetal Gandhi for skin discoloration that was reported to have been present "*for a few year[s]*." Ex. 7 at 18 (emphasis added). On examination, Dr. Gandhi noted and diagnosed hypopigmentation around A.W.'s mouth and knees before referring A.W. to dermatology. *Id.* at 18–20. A.W.'s pulse was measured at 108 beats per minute. *Id.* at 19.

Later that same August, A.W. was seen by Dr. Stephaine Schroder at the Rady Children's Hospital Emergency Department for a "head injury," a "skin problem" that had been present for the past two years, and a lump at the base of her neck. Ex. 4 at 13–14. Petitioner explained that A.W. had experienced two falls during a family hiking trip, and that she had complained of fatigue and abdominal cramping before fainting during a family photo, causing her to slip and fall to the ground. Ex. 4 at 14. Petitioner relayed that A.W. had seen a chiropractor the after the fall for an adjustment on A.W.'s ribs, and the chiropractor expressed concern about the lump at the base of A.W.'s neck. *Id.* A.W. had been complaining about experiencing dizziness and fatigue since the fall. *Id.* Petitioner also explained that A.W.'s preexisting white skin patches seemed to grow after the trip. *Id.*

On physical examination, Dr. Schroder measured A.W.'s heart rate as 104 beats per minute, and noted hypopigmented skin lesions around her knees and perioral area. Ex. 4 at 15–18. A.W. denied shortness of breath, abdominal pain, or nausea. *Id.* at 14. A.W. exhibited normal cervical range of motion on exam and an x-ray and EKG were negative for neck injury and arrythmia respectively. *Id*. at 15–18. A.W. was discharged home in stable condition, referred to dermatology, recommended to try Selsun blue on her skin, and given pamphlets on syncope (fainting). *Id*. at 19–23.

A.W. returned to see Dr. Gandhi for a well child check on September 13, 2022. Ex. 7 at 22. She was diagnosed with bilateral impacted cerumen and hearing loss. *Id.* at 23.

A.W. then went to Rady Rheumatology in mid-October 2022, where she saw Dr. Johanna Chang for concerns about her white spots and to "rule out autoimmune disease." Ex. 4 at 65. A.W.'s examination revealed her heart rate of 117 beats per minute, and her blood pressure was 110/72. *Id.* A.W.'s skin was noted to have "hypopigmentation periorally," "hypopigmented macules right 2nd and 3rd PEP," and "hypopigmented macules below both knees." *Id.* at 69. Dr. Chang ordered laboratory tests that showed low thyroid-stimulating hormone ("TSH") levels. *Id.* at 75. Dr. Chang diagnosed A.W. with hypopigmentation and informed the Petitioner that he could only assess autoimmune musculoskeletal diseases, but did not specialize in all autoimmune diseases. *Id.* at 69.

On October 21, 2022, dermatologist Dr. Asadeh Shirazi evaluated A.W., and diagnosed her with vitiligo.[4] Ex. 5 at 3. Dr. Shirazi did note that vitiligo is associated with thyroid disease, pernicious anemia, and diabetes. *Id.*

Roughly a month later (November 16, 2022), A.W. went to Rady Endocrinology for a endocrinology consultation and "low TSH." Ex. 4 at 79. A physical examination revealed a blood pressure of 117/69 and a pulse rate of 107. *Id.* at 83. The doctor documented a "hypopigmented patch" on A.W.'s right knee and "spots around [her] mouth," along with a soft, non-tender "goiter" on petitioner's neck, which was "5.5 cm" and had "no nodules," and took note of a family history of thyroid issues. *Id.* at 83–84. Lab results revealed low TSH and elevated total T4 and free T4. *Id.* at 84. A.W.'s physician offered differential diagnoses of Graves' disease and Hashitoxicosis at the end of her visit, but did not diagnose her based on these preliminary results. *Id.* Instead, the physician planned to obtain thyroid function tests and treat A.W. based on the results of those tests. *Id.*

On December 2, 2022, A.W. was seen at her PCP's office for abdominal and chest pain, coughing, and sore throat that she had been experiencing since Thanksgiving. Ex. 7 at 30. A.W. tested negative for influenza and covid and was diagnosed with flu-like symptoms and gastrointestinal reflux symptoms. *Id.* at 32.

Treaters at Rady Endocrinology received A.W. lab results that showed continued low TSH and elevated total T4, free T4, and total T3. Ex. 4 at 85–86. Days after receiving these results, on

[4] Vitiligo is a chronic, progressive disorder where colored skin cells are destroyed and leave white patches on the skin. *See Vitiligo,* Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=53308&searchterm=vitiligo (last visited Aug. 27, 2026).

December 13, 2022, A.W. was started on 5mg of MMI (Methimazole)[5] and 10mg of propranolol[6] to treat hyperthyroidism. *Id.* at 86.

Between February and November 2023, A.W. was seen at her pediatrician's office for nasal congestion, ear pain, nausea after a fall, and anxiety and depression due to bullying at school. Ex. 7 at 41, 44, 47, 56. Then, in March, A.W. was admitted to Rady Children's Hospital for "new onset diabetes." Ex. 55 at 174. The provider noted that A.W.'s Graves' disease was now considered in remission, although her hypopigmented skin and goiter were present. *Id.* at 174–75.

*Affidavit Testimony*

Petitioner originally submitted a sworn statement along with the Petition outlining A.W.'s condition before and after her vaccinations. Statement of Traci Weiss, dated Apr. 16, 2024, filed as Ex. 1 (ECF No. 6-1) ("Traci Weiss Statement"). Petitioner detailed how the family has a history of hyperimmune conditions, autoimmune conditions, and immune cancers, which include Juvenile Rheumatoid Arthritis, Hashimoto's disease, and lymphoma. *Id.* at 1. Before her vaccinations, A.W. used to be a ball of energy and was healthy. *See id.* After, however, A.W. developed Graves' disease, vitiligo, and anxiety. *See id.* In particular, Petitioner claims that roughly one month after the January 3, 2022 vaccinations, A.W. started to develop significant depigmentation on A.W.'s lower extremities, heart palpitations, eye pain, headaches, light sensitivity, chest pain, abdominal complaints, fatigue, anxiety, and a goiter. *Id.* at 2; *see also* Affidavit of Traci Weiss, dated Sep. 29, 2025, filed as Ex. 56 (ECF No. 31-3) ("Traci Weiss Aff.") at 2. Petitioner claimed that A.W. did not experience any of these symptoms before this time. Statement of Traci Weiss at 2.

Other members of A.W.'s family also submitted sworn affidavits along with Petitioner's Response to the Show Cause Order issued in this matter, and they purport comparable observations. Brandon Weiss, A.W.'s father, recounted that A.W. was a healthy child before her vaccinations, and it was only after receiving them that A.W. started to experience symptoms such as a white spot developing at the corner of her mouth, severe fatigue, stomach pains, chest discomfort, eye sensitivity and pain, headaches, sensitivity to light, anxiety, depression, and "emotional withdrawal from friends." Affidavit of Brandon Weiss, dated Sep. 29, 2025, filed as Ex. 58 (ECF No. 31-5) ("Brandon Weiss Aff.") at 2–3. These symptoms led Mr. Weiss to demand an autoimmune and blood panel which led to the diagnosis of A.W.'s Graves' disease diagnosis. *Id.* at 3. A.W.'s grandmother, Lori West, also provided an affidavit attesting that it was only on

[5] Methimazole is a thyroid inhibitor used to treat hyperthyroidism. *Methimazole*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=30917&searchterm=methimazole (last visited Aug. 27, 2026).

[6] Propranolol is a beta-blocker that prevents hormones from affecting organs, specifically used to reduce heart rate and blood pressure. *See Propranolol*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=41268&searchterm=propranolol (last visited Aug. 27, 2026).

February 23, 2022, that she noticed white patches around A.W.'s skin and mouth. Affidavit of Lori West, dated Sep. 29, 2025, filed as Ex. 57 (ECF No. 31-4) ("Lori West Aff.") at 1–2.

## II. Petitioner's Expert[7]

Dr. Melvin Berger, M.D., Ph.D. — Dr. Berger is a clinical immunologist, and he prepared two written reports in support of A.W.'s claim. Report, dated Apr. 4, 2025, filed as Ex. 52 (ECF No. 21-42) ("First Berger Rep."); Report, dated May 16, 2025, filed as Ex. 54 (ECF No. 22-2) ("Second Berger Rep.").

Dr. Berger earned both his M.D. and Ph.D. from Case Western Reserve University, and served as a resident in Pediatrics at Boston Children's Hospital before undergoing a fellowship in Allergy and Immunology at the National Institute of Health. Curriculum Vitae, filed as Ex. 53 (ECF No. 21-43) at 1–2. Afterwards, Dr. Berger was the Assitstant Chief of Allergy-Immunology at Walter Reed Army Medical Center and the Chief of Immunology and Professor of Pediatrics and pathology at Case Western Reserve University. *Id.* at 2. Dr. Berger has authored or co-authored over one-hundred twenty peer-reviewed publications pertaining to immunology. *Id.* at 8–17. Dr. Berger continues to teach at Case Western Reserve University as an Adjunct Professor of Pediatrics and Pathology, and is now a self-employed consultant and subject matter expert. *Id.* at 1–2.

*First Report*

Dr. Berger opined that the immune stimulation caused by the series of vaccines A.W. received triggered the development of her Graves' disease and vitiligo. First Berger Rep. at 10.

Hyperthyroidism and/or Graves' disease (which Dr. Berger noted were both forms of autoimmune thyroid disease) are disorders where the thyroid gland produces excessive hormones for a number of reasons—including due to autoimmune processes. First Berger Rep. at 8 (quoting D. Ross et al., *2016 American Thyroid Association Guidelines for Diagnosis and Management of Hyperthyroidism and Other Causes of Thyrotoxicosis*, 26 Thyroid 1343, 1344 (2016), filed as Ex. 41 (ECF No. 21-31)); A. Michaels & G. Eisenbarth, *Immunologic Endocrine Disorders*, 125 J. Allergy Clin. Immunol. (2nd Supp.) S226, S231 (2010), filed as Ex. 35 (ECF No. 21-25) ("Michaels & Eisenbarth")). Interferons and IFN-induced chemokines are specifically thought to be the trigger for a positive feedback loop that perpetuates and exacerbates an autoimmune process by stimulating T cells. First Berger Rep. at 8 (citing A. Antonelli et al., *Chemokine (C-X-C motif) Ligand (CXCL)10 in Autoimmune Diseases*, 13 Autoimmunity Revs. 272, 273–74 (2014), filed as Ex. 16 (ECF No. 21-6)).

[7] Respondent defends the case solely on the medical record (and its lack of support establishing a medically acceptable onset of vitiligo symptoms pre or post-vaccination), and did not file an expert report of his own.

Environmental stimuli, such as vaccines or infections, Dr. Berger contended, can provide the immune stimuli needed to induce an autoimmune thyroid disease. First Berger Rep. at 8–9 (discussing N. Pollack-Schreiber et al., *Increased Incidence of Graves' Disease During the COVID-19 Pandemic in Children and Adolescents in the United States*, 15 Frontiers in Endocrinology 1, 3–4 (2024), filed as Ex. 38 (ECF No. 21-28) ("Pollack-Schreiber") (noting that the reason for the rise of Graves' disease during the COVID-19 Pandemic is hypothesized to be attributable to immune stimulation after exposure to the SARS-CoV-2 virus); V. Singhal & S. Gupta, *Post-COVID-19 Vaccination and Thyrotoxicosis (ASIA Syndrome): Single-Centre Experience from India with Review of Literature*, 27 In. J. Endocrinology & Metabolism 524, 525–28 (2023), filed as Ex. 44 (ECF No. 21-34) ("Singhal & Gupta") (assessing development of autoimmune thyroid disease in relation to receipt of COVID-19 vaccine)). Certain infections are also known to increase the risk of Graves' disease or other autoimmune thyroid diseases—*Helicobacter pylori*, *Yersinia enterocolitica,* and Hepatitis C virus. First Berger Rep. at 8–9 (discussing Y. Cuan-Baltazar & E. Soto-Vega, *Microorganisms Associated to Thyroid Autoimmunity*, 19 Autoimmunity Revs. 1, 2–3, 5 (2020), filed as Ex. 25 (ECF No. 21-15)).

Vitiligo is also a likely autoimmune disorder, Dr. Grimes contended. First Berger Rep. at 6; P. Grimes, *Vitiligo: Management and Prognosis,* filed as Ex. 29 (ECF No. 21-19) ("Grimes") at 1. It occurs through generation of certain autoantibodies that attack melanocytes,[8] leading to depigmentation and white patches on the skin. *Id.* (discussing Grimes at 1). Many immune deficiencies have been reported in patients with vitiligo—which has led to the question of whether the pathogenesis of vitiligo involves autoimmunity. *Id.* (discussing Grimes at 1). Cytokines have also been hypothesized to activate T cells that target melanocytes, triggering or exacerbating vitiligo in individuals. *Id.* at 7 (referencing C. Bergqvist & K. Ezzedine, *Vitiligo: A Focus on Pathogenesis and its Therapeutic Implications,* 48 J. Dermatol. 252, 253 (2021), filed as Ex. 19 (ECF No. 21-9)). Vitiligo itself can also lead to the production of cytokines that can increase sensitivity to stresses and immunologic skin disease. *Id.* (citing K. Boniface et al., *Vitiligo: Focus on Clinical Aspects, Immunopathogenesis, and Therapy,* 54 Clin. Rev. Allergy Immunol. 52, 52 (2018), filed as Ex. 21 (ECF No. 21-11)).

Relying on the two descriptions he gave of each condition, Dr. Berger observed that autoimmune thyroid disease and vitiligo share common immunologic features with each other, including the loss of immune tolerance, T-cell and IFN-driven reactivity, and the production of autoantibodies. First Berger Rep. at 9–10. In addition, autoimmune thyroid disease is associated with the production of interferons and IFN-induced chemokines, while vitiligo is associated with cytokine production. *Id.* at 7–8. These similarities are critical to understanding how they could have developed in A.W. as a result of vaccination. *See id.* at 9–10.

---

[8] Melanocytes are epidermis cells that produce melanin. *Melanocyte,* Dorland's Medical Dictionary Online www.dorlandsonline.com/dorland/definition?id=30215 (last visited Aug. 7, 2026).

A recent report issued by the National Academies Sciences, Engineering, and Medicine ("NASEM") lists four mechanisms relevant to how vaccine-induced autoimmune diseases might occur: (1) molecular mimicry, (2) bystander activation, (3) epitope spreading, and (4) polyclonal activation and adjuvant-induced autoimmunity. First Berger Rep. at 9 (citing *National Academies of Sciences, Engineering, and Medicine, Evidence Review of the Adverse Effects of COVID-19 Vaccination and Intramuscular Vaccine Administration*, 28 tbl.2-2 (A. Bass et al. eds., 2024), filed as Ex. 36 (ECF No. 21-26) ("NASEM Rep.")). Dr. Berger conceded that there is no antigen known to be common to the skin and thyroid that would be the target of an autoantibody attack after vaccination, so molecular mimicry was not the likely mechanism for disease in this case. *Id.* However, bystander activation, which "occurs when localized inflammation exposes self-antigens, leading to the activation of previously dormant self-reactive lymphocytes," could be responsible for A.W.'s condition—triggering an immune response in A.W. that recognized one or more antigens expressed on multiple cell-types, and accounting for the immune system attack on two different organs. *Id.* A.W.'s genetic predisposition to autoimmune thyroid dysfunction in tandem with the likely-significant immune stimulation of receiving ten vaccines in quick succession could have increased production of interferons and cytokines capable of sparking disease. *Id.* at 9–10.

Dr. Berger next turned to the question of onset of Graves' disease/hyperthyroidism. Children with hyperthyroidism may have few clinical "manifestations" of the disease, or may be asymptomatic—which could delay the diagnosis (while making it difficult to ascertain its likely onset). First Berger Rep. at 4 (quoting S. La Franchi & A. Wassner, *Clinical Manifestations and Diagnosis of Graves's disease in Children and Adolescents,* UpToDate, 2 (2024), filed as Ex. 33 (ECF No. 21-23) ("La Franchi & Wassner"). But symptoms can include elevated heart rate and excited behaviors, such as restlessness, behavioral problems at school, or "emotional instability" (quarrelsomeness, easy excitability, etc.). *Id.* (discussing S. Hara & N. Krohn, *Juvenile Thyrotoxicosis in Black Children,* 67 J. Nat. Med. Assoc. 444, 445–46 (1975), filed as Ex. 30 (ECF No. 21-20) ("Hara & Krohn"); C. Koch & N. Sarliss, *The Spectrum of Thyroid Diseases in Childhood and its Evolution During Transition to Adulthood: Natural History, Diagnosis, Differential Diagnosis and Management*, 24 J. Endocrinol. Invest. 659, 660, filed as Ex. 32 (ECF No. 21-22) ("Koch & Sarlis"); M. Forssberg et al., *Increasing Incidence of Childhood Thyrotoxicosis in a Population-Based Area of Central Sweden,* 93 Acta. Paediatr. 25, 27 tbl.3 (2004), filed as ex. 28 (ECF No. 21-18) ("Forssberg")).

Dr. Berger opined that A.W.'s hyperthyroidism/vitiligo onset occurred roughly one month after receiving her last vaccination in January 2022. First Berger Rep. at 4. In support, he noted that this was when her family started noting behavioral differences and growing depigmentation (although as previously noted there is no medical record corroboration for these assertions). *See id.* at 3–10. He also offered certain testing results from much later on as proof, based on the foregoing literature about the association between the condition and heart rate (plus complaints of

headaches, fatigue, and anxiety). Thus, Dr. Berger found it notable that A.W.'s pulse rate did not exceed 92 in her medical records until the time period after her last vaccination in January 2022—with her pulse rate measured at 100 and 103 on August 27, 2022 (albeit several months later). *Id.* (referencing Ex. 4 at 15, 18). A.W.'s pulse rate was later measured at 117 on October 17, 2022, at her rheumatology visit. *Id.* (referencing Ex. 4 at 67). No other symptoms of hyperthyroidism were present at these visits. *Id.* (referencing Ex. 4 at 15, 18, 65–67). It was only after blood work on November 16, 2022, that A.W.'s hyperthyroidism was diagnosed. *Id.* (referencing Ex. 4 at 84). This progression was evident of a post-vaccination change—and Dr. Berger did not deem it to have occurred only as of the date of diagnosis.

Dr. Berger also opined that A.W.'s injuries likely developed in tandem. First Berger Rep. at 5. In support, he referenced medical studies and reviews demonstrating a bidirectional association between patients with both vitiligo and autoimmune thyroid disorders. *Id.* The authors of a meta-analysis of 55 individual studies of patients with vitiligo found that 51 of those studies showed the patients also experienced increased hyperthyroidism. *Id.* (discussing J. Yuan et al., *The Prevalence of Thyroid Disorders in Patients With Vitiligo: A Systematic Review and Meta-Analysis*, 9 Frontiers in Endocrinology 1, 10 (2019), filled as Ex. 50 (ECF No. 21-40) ("Yuan") (assessing the prevalence of thyroid disorders in patients with vitiligo and finding that while Graves' disease and hyperthyroidism was prevalent in those with vitiligo, it was the lowest prevalence of six thyroid disorders)). Database review studies found statistically significant patients with vitiligo also had thyroid disorders. *Id.* (discussing V. Eleftheriadou et al., *Burden of Disease and Treatment Patterns in Patients with Vitiligo: Findings from a National Longitudinal Retrospective Study in the UK*, 191 Br. J. Dermatol. 216, 218–19 (2024), filed as Ex. 26 (ECF No. 21-16) ("Eleftheriadou") (finding thyroid disease as a comorbidity in 7.5% of 17,239 identified individuals with vitiligo); J. Estebaranz et al., *Real-World Evidence for Vitiligo Using an Electronic Medical Records Database in Spain: the REVEALES Study*, 34 Eur. J. Dermatol. 251, 256 (2024), filed as Ex. 27 (ECF No. 21-17) ("Estebaranz") (finding a significant rate of thyroid disease in individuals with vitiligo); N. Van Geel et al., *Clinical Profile of Generalized Vitiligo Patients with Associated Autoimmune/Autoinflammatory Diseases*, 28 JEADV 741, 742 tbl.1 (2014), filed as Ex. 47 (ECF No. 21-37) ("Van Geel") (close to 10% of the pool of 699 individuals with vitiligo also developed autoimmune thyroid disease)). A sizeable number of individuals with autoimmune thyroid diseases have also been observed to develop vitiligo. *Id.* at 5–6. (discussing S. Artanas et al., *Skin Findings in Thyroid Diseases*, 20 Eur. J. Internal Med. 158, 159 (2009), filed as Ex. 18 (ECF No. 21-8) ("Artanas") (finding a significant comorbidity of vitiligo in individuals with hyperthyroidism)). However, it is important to note that this association is only present in those experiencing autoimmune thyroid disease as opposed to non-autoimmune thyroid disease. *Id.* (citing Artanas at 160–61). Another factor supporting the opinion that A.W.'s vitiligo developed in tandem with her Graves' disease was her family history of autoimmune thyroid disease. *Id*. at 6.

Dr. Berger did not submit a timeframe or literature supporting a timeframe for when development of vitiligo or autoimmune thyroid disease would be medically expected when attributable to immunization or exposure to other environmental factors. *See generally* First Berger Rep.

*Second Report*

Dr. Berger's supplemental report focused on the record evidence he deemed to establish a medically-acceptable, post-vaccination onset for A.W.'s vitiligo and Graves' disease. Dr. Berger began by addressing concerns regarding A.W.'s "small spot around her mouth" that the record establishes was present *prior* to her vaccinations. Second Berger Rep. at 1. In response, Dr. Berger pointed out that there was no detailed characterization or pathological diagnosis for this discolored spot. *Id.* If this discoloration had been present since birth, it might simply be a nevus achromacis[9] or nevus depigmentosus[10]—neither of which would constitute vitiligo, in contrast with the large patches of discoloration Petitioner noticed on A.W. after her vaccinations. *Id.* And even if the small white patch near A.W.'s mouth was a stable area of vitiligo, then the enlargement of that patch and the development of patches on her knees after vaccinations were proof of the condition's vaccine-induced aggravation. *Id.*

The onset of A.W.'s hyperthyroidism, however, could only in Dr. Berger's opinion have occurred after the vaccinations. Second Berger Rep. at 1–2. He noted an absence of evidence that A.W. had hyperthyroidism or any other autoimmune disease before her immunizations. *Id.* at 1. But after A.W.'s final vaccinations (in January 2022), Petitioner had (albeit in witness statements) reported that A.W. began to experience fatigue, heart palpitations, eye pain, headaches, light sensitivity, chest pain, anxiety, and abdominal pain. *Id.* (citing Pet. at 4). Dr. Berger reiterated his prior contention that hyperthyroidism can be insidious, with the changes it produces occurring subtly and long before a diagnosis is possible. *Id.* (referencing La Franchi & Wassner at 2). The onset to diagnosis duration has in fact been measured to occur from months to over a year. *Id.* (discussing Hara & Krohn at 445 (following twelve patients with thyroid disease and finding that time from onset to diagnosis took from two to fourteen months)).

The physicians A.W. saw before her diagnosis were not likely to have ascertained the significance of any changes, or otherwise lacked the specific expertise needed. Second Berger Rep.

---

[9] A colorless birthmark. *Achromatic,* Dorland's Medical Dictionary Online, www.dorlandsonline.com/dorland/definition?id=526&searchterm=achromatic (last visited Aug. 10, 2026); *Nevus,* Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=33929&searchterm=nevus (last visited Aug. 10, 2026).

[10] Nevus depigmentosus is a birthmark or skin anomaly usually characterized by irregular, hypopigmented (light) areas of skin appearing in bands along the torso. *Nevus depigmentosus,* Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=92811&searchterm=nevus%20depigmentosus (last visited Aug. 10, 2026).

at 2. A.W. was, for example, seen by an ear, nose, and throat physician's assistant for complaints of ear discomfort. *Id.* (referencing Ex. 4 at 8–10). Her visit to Dr. Gandhi was for evaluation of skin discoloration, which resulted in a referral to a dermatologist. *Id.* (discussing Ex. 7 at 19–20). Dr. Gandhi did not comment on A.W.'s high pulse rate of 108 and did not evaluate her for any symptoms that are indicative of hyperthyroidism (eye lid tag, tremor, or briskness of reflexes). *Id.* (citing Ex. 7 at 18–20). When A.W. was seen at Rady Memorial Hospital after fainting during a hike, her providers referred her to a dermatologist and gave instructions about syncope. *Id.* (citing Ex. 4 at 14–16). A.W.'s visit to a pediatric rheumatologist was also unenlightening as the rheumatologist only evaluated A.W. for autoimmune musculoskeletal diseases, like arthritis, without considering autoimmune thyroid disease. *Id.* (citing Ex. 4 at 69). In effect, no effort was being made by these treaters to look for the relevant signs of hyperthyroidism.

In making these arguments, Dr. Berger conceded an important fact: beyond the recollections of Petitioner or other family members, the record does not allow a conclusion as to the precise likely onset for A.W.'s vitiligo or Graves' disease/autoimmune thyroid disease. Second Berger Rep. at 3. But he again stressed the fact that in his review of the record, it did not appear treaters were focused on looking for what turned out to be A.W.'s medical issues. *See id.* He thus felt it was clear that her hyperthyroidism only developed roughly a month after the last of her vaccinations. *Id.* And A.W.'s vitiligo likely "exploded" after the last of her vaccinations, allowing for significant aggravation due to vaccination even if the condition predated vaccination. *See id.*

## III. Procedural History

Petitioner initiated this claim in April 2024. Pet. at 1. Respondent filed his Rule 4(c) Report contesting entitlement on October 24, 2024. Respondent's Report, dated Oct. 24, 2024 (ECF No. 14). Petitioner filed an expert report and a supplemental report in response. First Berger Rep.; Second Berger Rep.

I later held a status conference, and informed the Petitioner that I did not find the evidence filed (at least as of that time) to facially support the conclusion that the onset of A.W.'s symptoms likely occurred within a medically acceptable timeframe of any of the vaccinations at issue, and that it would be difficult even to identify a proposed date for onset at all. *See* Order to Show Cause. I set a briefing schedule for parties to respond to the Order. *Id.* That briefing was completed in December 2025, with the filing of Petitioner's Reply Brief, and the case has since that time been ripe for resolution. *See* Reply.

## IV. Parties' Arguments

*Petitioner*

A medically appropriate timeframe between vaccination and onset requires the showing of both a timeframe for which an injury is expected to occur after vaccination, and that the vaccinee's experience is aligned with that timeframe. Br. at 14 (citing *de Bazan v. Sec'y of Health & Hum. Servs.,* 539 F.3d 1347, 1351–52 (Fed. Cir. 2008)). Petitioner argues that she has satisfied these requirements and met her burden to succeed on this prong for purposes of a causation in fact claim (as set by the Federal Circuit in *Althen v. Sec'y of Health and Hum. Servs.,* 418 F.3d 1274, 1278 (Fed. Cir. 2005)) or a significant aggravation claim (for the vitiligo).[11] Br. at 14–19.

For either condition, Petitioner alleges that A.W.'s onset occurred in February 2022—one month after A.W. received the last of her vaccines. Br. at 14. In support, Petitioner referenced Dr. Berger's reports and his cited literature, and stressed that the date of A.W.'s diagnosis was not coterminous with the date of her onset. *See id*. A.W.'s onset had been noticed by family months before her symptoms culminated in a diagnosis of Graves' disease. *Id*. at 14–16 (citing First Berger Rep.; Second Berger Rep.). And Graves' disease and hyperthyroidism may have few clinical manifestations, or may be asymptomatic for long periods of its development, and before the condition is evaluated. *Id.* at 14 (referencing La Franchi & Wassner at 2; Hara & Krohn at 445).

There is, however, some medical record evidence that supports a diagnosis not long after the January 2022 vaccinations. A.W.'s medical records revealed a consistently rapid pulse rate, developing goiter, and hypopigmentation in that timeframe. *See* Br. at 14–15 (referencing Ex. 4 at 84). These were signs of undiagnosed of Graves' disease, in Dr. Berger's opinion. *Id.* (referencing First Berger Rep. at 4). And the affidavits submitted in this matter detail A.W.'s symptoms in February 2022 that are also supportive of onset at that time. *Id.* at 15 (discussing First Berger Rep. at 4). Petitioner and other fact witnesses noted that A.W. was experiencing elevated heart rate, headache, chest pain, abdominal complaints, fatigue, and anxiety in February 2022, consistent with Graves' disease. *Id.* at 15–16 (quoting First Berger Rep. at 4). And A.W.'s vitiligo either began or was worsened in the same timeframe. *Id.* at 16 (discussing First Berger Rep. at 4).

On reply, Petitioner maintained that she has satisfied a medically appropriate onset (a month after the final January 2022 vaccination) that satisfies either a causation in fact claim or a significant aggravation claim. Reply at 2. In support, she referenced Dr. Berger's opinion that A.W.'s vitiligo and Graves's disease developed simultaneously, and that Dr. Berger did not attribute different symptoms to each injury. Petitioner points out that Dr. Berger explained the unique symptoms for each autoimmune disease, where vitiligo presents as depigmentation and autoimmune thyroid disorder has many subtle symptoms ranging from physical to behavioral. *Id.* at 3–4 (discussing First Berger Rep. at 6). In addition, Dr. Berger emphasized the frequency of

[11] My Order to Show Cause directed the parties file briefs offering evidence to establish a medically acceptable timeline between vaccination and onset of symptoms. Order to Show Cause at 2. In order to do this, I specifically told Petitioner that she must show a more definite timing of the onset of A.W.'s symptoms, and reliable scientific or medical evidence in support of the timing. *Id.* Therefore, I shall only summarize and analyze the portions of Petitioner's Brief and Reply that relate to onset.

comorbidity of autoimmune thyroid diseases and vitiligo. *Id.* (referencing Yuan at 10; Van Geel at 742; Eleftheriadou at 218–19; Estebaranz at 256). Where there is one, there is a significant chance of the other. *Id.*

In response to Respondent's argument that A.W.'s vitiligo likely began years before her vaccinations, Petitioner once again turned to Dr. Berger's opinion for support. Reply at 4. It was Dr. Berger who noted that Dr. Gandhi had not provided a pathological diagnosis of A.W.'s discoloration, and that the discolored spot that predated vaccination might be something other than vitiligo. *Id.* (citing Second Berger Rep. at 1). And the development of lesions on A.W.'s knees, and growth of depigmentation around her mouth, were documented to have occurred roughly a month post-vaccination. *Id.* at 4–5 (citing Second Berger Rep. at 1; Ex. 4 at 65).

In arguing onset, Petitioner defended the use of witness statements to support onset in this matter, emphasizing their legitimacy regardless of when they were created. Reply at 5–8; *James-Cornelius ex rel. E. J. v. Sec'y of Health & Hum. Servs*., 984 F.3d 1374, 1380–81 (Fed. Cir. 2021) (finding that affidavits of the vaccinee and mother were improperly rejected on the grounds that they could never be considered objective evidence); *Tenneson v. Sec'y of Health & Hum. Servs.*, No. 16-1664V, 2018 WL 3083140, at *5 (Fed. Cl. Spec. Mstr. Mar. 30, 2018) (finding Petitioner's affidavits reasonable and credible). The affidavits in this case reasonably supplemented A.W.'s medical records, and collectively establish that A.W.'s onset likely occurred weeks after her January 2022 vaccinations. *Id.* at 5–6 (discussing Traci Weiss Aff. at 2; Lori West Aff. at 1; Brandon Weiss Aff. at 2). And there is no presumption that medical records are accurate and complete, so it is crucial that a Special Master consider the context of a medical encounter before drawing a conclusion that it is evidence of the presence or absence of a condition. *Id.* at 7.

*Respondent*

Respondent argues that Petitioner has not submitted preponderant evidence in support of the conclusion that onset of A.W.'s condition occurred within a month of the January 2022 vaccinations. Opp. at 10. The only evidence in favor of that are fact witness statements and Dr. Berger's expert reports. *Id.* The record is devoid of objective record proof that could be reasonably corroborated or supplemented with witness statements or expert interpretation. *Id.* The first appearance of A.W.'s hyperthyroid condition evident from the medical records occurred in August 2022—roughly *eight months* after A.W.'s last vaccination. *Id.* (referencing Ex. 7 at 18).

Respondent also took issue with the extent to which the Petitioner and her expert appear to have lumped together A.W.'s vitiligo and Graves' disease, giving them the same onset date and not clearly separating which symptoms belong to which disease. Opp. at 10. Respondent holds that the injuries are different, and likely had different onset dates based on the record. *Id.* at 11, 14–15.

Although Petitioner has relied heavily in this case on witness statements, Respondent contended that a Petitioner cannot prevail on a finding of fact based on witness testimony alone. Opp. at 12 (quoting *Clavio v. Sec'y of Health & Hum. Servs*., No. 17-1179V, 2020 WL 1672956, at *7 (Fed. Cl. Spec. Mstr. Mar. 11, 2020). And the witness affidavits filed in this matter are unreliable. Opp. at 10–12. All were prepared more than three years from the events at issue and contradict the medical records. *See id.*; Traci Weiss Aff.; Brandon Weiss Aff.; Lori West Aff. They suggest that A.W. began to experience new depigmentation and a myriad of other symptoms (headaches, eye pain, sensitivity to light, severe fatigue, palpitations, chest pain and discomfort, stomach pains, anxiety, depression, and emotional withdrawal from friends) in February 2022. Opp. at 11 (referencing Traci Weiss Aff.; Brandon Weiss Aff.; Lori West Aff). But Petitioner did not seek to have A.W. treated for these issues until months later, with several intervening appointments that make no mention of any comparable concerns. Opp. at 11; Ex. 4 at 8; Ex. 7 at 18). Other records (such as A.W.'s August 2022 treatment after her hiking trip fainting incident) referenced vitiligo-like symptoms that long predated even the August 2021 vaccinations, and made no reference to symptoms that had begun in the winter of 2022. Opp. at 12 (referencing Ex. 4 at 8–14).

With regards to onset of A.W.'s Graves' disease, Dr. Berger conceded that the only record evidence corroborating onset in February 2022 was Petitioner's affidavit. Opp. at 13 (quoting Ex. 54 at 1). Therefore, Dr. Berger's opinion was based on Petitioner's observations and recollection alone. *Id.* Respondent accepted that Graves' disease may have an insidious progression, but this did not mean that its onset could be pinpointed based solely on witness recollection that otherwise lacked record corroboration. *Id.* And to the extent A.W.'s elevated heart rate stood as an "objective benchmark" for her hyperthyroid condition, the evidence for it came from August 2022, over eight months from her last vaccinations. *Id.* at 14 (citing Ex. 4 at 13).

Dr. Berger was similarly unable to provide a preponderantly-supported onset date for A.W.'s vitiligo—whether vaccine-induced or merely aggravated. Opp. at 13. In fact, he seemed to concede that it was entirely uncertain whether A.W.'s vitiligo appeared before or after her vaccinations. *Id.* (citing Second Berger Rep. at 2). And to the extent this still left a possible significant aggravation claim, Dr. Berger relied for a date of aggravation that was substantiated only by witness statements—amounting to reliance on a petitioner's naked allegations (which is well understood in the Program to be an insufficient basis for entitlement). *Id.* at 13–14 (citing *Braun v. Sec'y of Health & Hum. Servs.,* No. 16-1098V, 2018 WL 2375751, at *20 (Fed. Cl. Spec. Mstr. Apr. 24, 2018); *Bradley v. Sec'y of Health & Hum. Servs.,* 991 F.2d 1570, 1574 (Fed. Cir. 1993)). At best, the record in this case established that A.W.'s vitiligo developed before her vaccinations, and may have worsened by August 2022. *Id.* (discussing Ex. 7 at 18–20). This timeframe has not been demonstrated to be medically acceptable.

## V. Applicable Legal Standards

A. *Petitioner's Overall Burden in Vaccine Program Cases*

To receive compensation in the Vaccine Program, a petitioner must prove either: (1) that he suffered a "Table Injury"—i.e., an injury falling within the Vaccine Injury Table—corresponding to one of the vaccinations in question within a statutorily prescribed period of time or, in the alternative, (2) that his illnesses were actually caused by a vaccine (a "Non-Table Injury"). *See* Sections 13(a)(1)(A), 11(c)(1), and 14(a), as amended by 42 C.F.R. § 100.3; § 11(c)(1)(C)(ii)(I); *see also Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010); *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1320 (Fed. Cir. 2006).[12] There is no Table claim for vitiligo or Graves' disease.

For both Table and Non-Table claims, Vaccine Program petitioners bear a "preponderance of the evidence" burden of proof. Section 13(1)(a). That is, a petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly*, 592 F.3d at 1322 n.2; *see also Snowbank Enter. v. United States*, 6 Cl. Ct. 476, 486 (1984) (mere conjecture or speculation is insufficient under a preponderance standard). Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Hum. Servs.*, 931 F.2d 867, 873 (Fed. Cir. 1991). In particular, a petitioner must demonstrate that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321 (quoting *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352–53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Hum. Servs*., 451 F.3d 1352, 1355 (Fed. Cir. 2006). A petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. Section 13(a)(1).

In attempting to establish entitlement to a Vaccine Program award of compensation for a Non-Table claim, a petitioner must satisfy all three of the elements established by the Federal Circuit in *Althen,* 418 F.3d at 1278: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury."

Each *Althen* prong requires a different showing. In this case, however, only the third prong is at issue (although it implicates to some extent the other two). The third *Althen* prong requires establishing a "proximate temporal relationship" between the vaccination and the injury alleged.

---

[12] Decisions of special masters (some of which I reference in this ruling) constitute persuasive but not binding authority. *Hanlon v. Sec'y of Health & Hum. Servs.*, 40 Fed. Cl. 625, 630 (1998). By contrast, Federal Circuit rulings concerning legal issues are binding on special masters. *Guillory v. Sec'y of Health & Hum. Servs.*, 59 Fed. Cl. 121, 124 (2003), *aff'd* 104 F. App'x. 712 (Fed. Cir. 2004); *see also Spooner v. Sec'y of Health & Hum. Servs.*, No. 13-159V, 2014 WL 504728, at *7 n.12 (Fed. Cl. Spec. Mstr. Jan. 16, 2014).

*Althen*, 418 F.3d at 1281. That term has been equated to the phrase "medically-acceptable temporal relationship." *Id.* A petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation." *De Bazan v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). The explanation for what is a medically acceptable timeframe must align with the theory of how the relevant vaccine can cause an injury (*Althen* prong one's requirement). *Id.* at 1352; *Shapiro v. Sec'y of Health & Hum. Servs.*, 101 Fed. Cl. 532, 542 (2011), *recons. den'd after remand*, 105 Fed. Cl. 353 (2012), *aff'd mem.*, 503 F. Appx. 952 (Fed. Cir. 2013); *Koehn v. Sec'y of Health & Hum. Servs.*, No. 11-355V, 2013 WL 3214877 (Fed. Cl. Spec. Mstr. May 30, 2013), *mot. for rev. den'd* (Fed. Cl. Dec. 3, 2013), *aff'd*, 773 F.3d 1239 (Fed. Cir. 2014).

B. *Legal Standards for Significant Aggravation Claim*

Where a petitioner alleges significant aggravation of a preexisting condition, the *Althen* test is expanded, and the petitioner has additional evidentiary burdens to satisfy. *Loving v. Sec'y of Health & Hum. Servs.*, 86 Fed. Cl. 135, 144 (2009). In *Loving*, the Court of Federal Claims combined the *Althen* test with the test from *Whitecotton v. Sec'y of Health & Hum. Servs.*, 81 F.3d 1099, 1107 (Fed. Cir. 1996), which related to on-Table significant aggravation cases. The resultant "significant aggravation" test has six components, which require establishing:

> (1)the person's condition prior to administration of the vaccine, (2) the person's current condition (or the condition following the vaccination if that is also pertinent), (3) whether the person's current condition constitutes a 'significant aggravation' of the person's condition prior to vaccination, (4) a medical theory causally connecting such a significantly worsened condition to the vaccination, (5) a logical sequence of cause and effect showing that the vaccination was the reason for the significant aggravation, and (6) a showing of a proximate temporal relationship between the vaccination and the significant aggravation.

*Loving*, 86 Fed. Cl. at 144; *see also W.C.*, 704 F.3d at 1357 (holding that "the *Loving* case provides the correct framework for evaluating off-table significant aggravation claims"). In effect, the last three prongs of the *Loving* test correspond to the three *Althen* prongs.

In *Sharpe v. Sec'y of Health & Hum. Servs.*, 964 F.3d 1072 (Fed. Cir. 2020), the Federal Circuit further elaborated on the *Loving* framework. Under Prong (3) of the *Loving* test, a petitioner need not demonstrate an *expected* outcome, but merely that her current-post vaccination condition was worse than pre-vaccination. *Sharpe*, 964 F.3d at 1081. And a claimant may make out a prima facie case of significant aggravation overall without eliminating a preexisting condition as the

potential cause of her significantly aggravated injury (although the Circuit's recasting of the significant aggravation standard still permits Respondent to attempt to establish alternative cause, after the burden of proof has shifted to Respondent). *Id.* at 1083.

It remains uncertain as to what *degree* of aggravation of a pre-vaccination condition would be enough to be considered "significant." The Circuit has made clear that the level of aggravation need not be shown to have been catastrophic. *Osenbach v. Sec'y of Health & Hum. Servs.*, No. 2024-1663, 2025 WL 2387944, at *4 (Fed. Cir. Aug. 188, 2025) ("[r]equiring a petitioner to demonstrate that vaccination "wholly altered" their pre-vaccination condition would be at odds with our holding in *Sharpe v. Sec'y of Health & Hum. Servs.* that the *Loving* test does not require petitioners to provide conclusive evidence linking their vaccines to their significant aggravation"). But this aspect of *Osenbach* (which otherwise affirmed dismissal of a significant aggravation claim) seems to pertain only to the well-understood fact that worsening need only be demonstrated *preponderantly*—like any other *Loving* or *Althen* prong.

At a minimum, then, a claimant's injury or disease course must *likely* exceed what that individual might have experienced but for vaccination. A transient worsening (say, due to usual vaccine-associated malaise, experienced immediately after vaccination but which subsides thereafter) is not sufficient—in keeping with the fact that all Program claimants must meet the six-month "severity requirement."[13]

C. *Legal Standards Governing Factual Determinations*

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records. Section 11I(2). The special master is required to consider "all [ ] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as the "results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." Section 13(b)(1)(A). The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (determining that it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence, such as oral testimony

[13] A person with an existing illness could not rely on the mere fact of that illness and its post-vaccination course to prove severity. Rather, they must preponderantly establish that any symptoms or disease worsening that can be linked to the vaccine results in more than six months of sequelae *specific* to the vaccine's impact. A transient post-vaccination reaction would not meet this standard, no matter how individually severe, if the reaction subsides in less than the Act's six-month timeframe – even if the preexisting condition persists. *See Faoro v. Sec'y of Health & Hum. Servs.*, No. 10-704V, 2016 WL 675491, at *27 (Fed. Cl. Spec. Mstr. Jan. 29, 2016), *mot. for review den'd*, 128 Fed. Cl. 61 (Fed. Cl. Apr. 11, 2016) (finding that "the vaccinations would not have changed [petitioner's] clinical course and thus, the vaccinations did not significantly aggravate her preexisting condition").

surrounding the events in question that was given at a later date, provided that such determination is evidenced by a rational determination).

As noted by the Federal Circuit, "[m]edical records, in general, warrant consideration as trustworthy evidence." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *Doe/70 v. Sec'y of Health & Hum. Servs.*, 95 Fed. Cl. 598, 608 (2010) ("[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), *aff'd*, *Rickett v. Sec'y of Health & Hum. Servs*., 468 F. App'x 952 (Fed. Cir. 2011) (non-precedential opinion). A series of linked propositions explains why such records deserve some weight: (i) sick people visit medical professionals; (ii) sick people attempt to honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in as accurate a manner as possible, so that they are aware of enough relevant facts to make appropriate treatment decisions. *Sanchez v. Sec'y of Health & Hum. Servs.*, No. 11–685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013); *Cucuras*, 993 F.2d at 1525 ("[i]t strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms").

Accordingly, if the medical records are clear, consistent, and complete, then they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs*., No. 03–1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). Indeed, contemporaneous medical records are often found to be deserving of greater evidentiary weight than oral testimony—especially where such testimony conflicts with the record evidence. *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Hum. Servs*., 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992), *cert. den'd*, *Murphy v. Sullivan*, 506 U.S. 974 (1992) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1947) ("[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight.")).

However, the Federal Circuit has also noted that there is no formal "presumption" that records are accurate or superior on their face to other forms of evidence. *Kirby v. Sec'y of Health & Hum. Servs.,* 997 F.3d 1378, 1383 (Fed. Cir. 2021). There are certainly situations in which compelling oral or written testimony (provided in the form of an affidavit or declaration) may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health & Hum. Servs*., 69 Fed. Cl. 775, 779 (2006) ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie*, 2005 WL 6117475, at *19 ("[w]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent") (quoting *Murphy*, 23 Cl. Ct. at 733)). Ultimately, a determination regarding a witness's credibility is needed when determining the

weight that such testimony should be afforded. *Andreu*, 569 F.3d at 1379; *Bradley v. Sec'y of Health & Hum. Servs*., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

When witness testimony is offered to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Sanchez*, 2013 WL 1880825, at *3 (citing *Blutstein v. Sec'y of Health & Hum. Servs*., No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs*., 110 Fed. Cl. 184, 203–04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). In making a determination regarding whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at hearing, there must be evidence that this decision was the result of a rational determination. *Burns*, 3 F.3d at 417.

D. *Analysis of Expert Testimony*

Establishing a sound and reliable medical theory often requires a petitioner to present expert testimony in support of his claim. *Lampe v. Sec'y of Health & Hum. Servs*., 219 F.3d 1357, 1361 (Fed. Cir. 2000). Vaccine Program expert testimony is usually evaluated according to the factors for analyzing scientific reliability set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594–96 (1993). *See Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1339 (Fed. Cir. 2010) (citing *Terran v. Sec'y of Health & Hum. Servs.*, 195 F.3d 1302, 1316 (Fed. Cir. 1999). Under *Daubert*, the factors for analyzing the reliability of testimony are:

> (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards for controlling the error; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Terran*, 195 F.3d at 1316 n.2 (citing *Daubert*, 509 U.S. at 592–95).

In the Vaccine Program the *Daubert* factors play a slightly different role than they do when applied in other federal judicial settings, like the district courts. Typically, *Daubert* factors are employed by judges (in the performance of their evidentiary gatekeeper roles) to exclude evidence that is unreliable or could confuse a jury. By contrast, in Vaccine Program cases these factors are

used in the *weighing* of the reliability of scientific evidence proffered. *Davis v. Sec'y of Health & Hum. Servs*., 94 Fed. Cl. 53, 66–67 (2010) ("uniquely in this Circuit, the *Daubert* factors have been employed also as an acceptable evidentiary-gauging tool with respect to persuasiveness of expert testimony already admitted"). The flexible use of the *Daubert* factors to evaluate the persuasiveness and reliability of expert testimony has routinely been upheld. *See, e.g.*, *Snyder*, 88 Fed. Cl. at 742–45. In this matter (as in numerous other Vaccine Program cases), *Daubert* has not been employed at the threshold, to determine what evidence should be admitted, but instead to determine whether expert testimony offered is reliable and/or persuasive.

E. *Resolution of Claim Upon Written Record*

I have opted to decide entitlement in this case based on written submissions and evidentiary filings, including the expert reports filed by each side. The Vaccine Act and Rules not only contemplate but encourage special masters to decide petitions on the papers rather than via evidentiary hearing, where (in the exercise of their discretion) they conclude that the former means of adjudication will properly and fairly resolve the case. Section 12(d)(2)(D); Vaccine Rule 8(d). The choice to do so has been affirmed on appeal. *See D'Toile v. Sec'y of Health & Hum. Servs*., No. 15-85V, 2018 WL 1750619, at *2 (Fed. Cir. Apr. 12, 2018); *see also Hooker v. Sec'y of Health & Hum. Servs*., No. 02-472V, 2016 WL 3456435, at *21 n.19 (Fed. Cl. Spec. Mstr. May 19, 2016) (citing numerous cases where special masters decided on the papers in lieu of hearing and that decision was upheld). I am simply not required to hold a hearing in every matter, no matter the preferences of the parties. *Hovey v. Sec'y of Health & Hum. Servs*., 38 Fed. Cl. 397, 402–03 (1997) (special master acted within his discretion in denying evidentiary hearing); *Burns*, 3 F.3d at 417.

## ANALYSIS

*Althen* Prong three/*Loving* prong six requires a claimant to establish a "proximate temporal relationship" between the vaccination and the alleged injury. *Althen*, 418 F.3d at 1278. A Petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe for which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation-in-fact." *de Bazan*, 539 F.3d at 1352. The explanation for what is a medically-acceptable timeframe must also coincide with the theory of how the relevant vaccine can cause the injury alleged under *Althen* prong one. *Id*.; *Koehn v. Sec'y of Health & Hum. Servs*., 773 F.3d 1239, 1243 (Fed. Cir. 2014); *Shapiro*, 101 Fed. Cl. at 542. And (as argued by Dr. Berger) the date of diagnosis of a condition is not the same as its onset. *Yalacki v. Sec'y of Health & Hum. Servs.*, No. 14-278V, 2019 WL 1061429, at *37 (Fed. Cl. Jan. 31, 2019), *mot. for review den'd*, 146 Fed. Cl. 80 (2019) ("onset is a function of the initial symptom rather than date of diagnosis, under applicable Vaccine Program law"); *Markovich v. Sec'y of Health & Hum. Servs.,* 477 F.3d 1353, 1360 (Fed. Cir. 2007)

(holding that the statute of limitations for filing a Program claim starts from the first symptom or manifestation of onset of a vaccine-related injury—not the date of diagnosis).

My order to show cause directed Parties to discuss what evidence exists that substantiates onset of A.W.'s condition, and establishes its medical acceptability. If *Althen* prong three/*Loving* prong six is not met, then Petitioner's claim for entitlement cannot be established, since all prongs must be met to satisfy a significant aggravation or causation-in-fact claim. *Dobrydnev v. Sec'y of Health & Hum. Servs*., 566 Fed. Appx. 976, 980 (Fed. Cir. 2014). As explained below, the record does not support the conclusion that onset of A.W.'s hyperthyroidism or vitiligo occurred/was vaccine-exacerbated in a medically-acceptable timeframe—and it also has not been shown *what* that timeframe would even be.

## I. A.W.'s Autoimmune Thyroid Disease/Graves' Disease

There is no evidence in this case that A.W. was experiencing Graves' disease before any of her relevant vaccinations, and so it is proper to analyze onset issues for this aspect of the claim based on *Althen* prong three. But the record in this case does not support a finding that onset of A.W.'s Graves' disease likely occurred in February 2022—and in fact *no* onset date can be ascertained on this record.

Admittedly, establishing onset for Graves' disease can be difficult. *See* La Franchi & Wassner at 2. With vague and nonspecific symptoms like fatigue, elevated heart rate, and excited behaviors as associated with this condition, the Petitioner could point to virtually any instance from her memory, or identify a secondary finding at a medical appointment, and attempt to elevate it to the status of onset. *See* Hara & Krohn at 445–46; Koch & Sarliss at 660; Forssberg at 27. In addition, patients cannot be expected to ascertain the significance of certain symptoms when they are occurring, and may well ignore, or even forget, concerns that can in hindsight be deemed to reflect the start of something more medically serious. And it also is the case that when a medical condition or disease is formally diagnosed does not constitute its onset—and thus, when as here a condition that develops insidiously and/or over time is at issue, it is reasonable to work backward in time from the date of diagnosis.

Nevertheless, in making onset determinations I am tasked with weighing the evidence in its totality—and that means starting with the actual medical record, which has some inherent reliability even if it is subject to supplementation or qualification by other forms of evidence. Here, that record establishes that A.W. saw medical providers between her January 2022 vaccinations and August 27, 2022, visit when her Graves' disease symptoms were first documented—but at no time in this period were any hyperthyroid-like symptoms discussed. *See, e.g*., Ex. 4 at 8 (July 27, 2022, visit). This is true even when vitiligo-like concerns were reported. Ex. 7 at 18–20.

It was only in August 27, 2022—eight months after A.W.'s vaccinations—when concerns associated with hyperthyroidism were mentioned (elevated heart rate and fatigue). Ex. 7 at 18. And what is more, no reference at this time was made to issues that started six months before, as now alleged. In fact, it was at the subsequent treatment events from the fall of 2022 that additional symptoms supportive of a Graves' disease/hypothyroidism diagnosis were mentioned—evidence in favor of a progression of symptoms *in that timeframe,* but not before. This, the medical record *itself* does not support onset of Graves' disease prior to August 2022 at the earliest.

Petitioner attempts to fill in gaps with witness statements, but they have problems of corroboration and reliability. The affidavits submitted by Petitioner or A.W.'s family certainly contend that A.W. was experiencing chest pain, heart palpitations, eye pain and eye sensitivity, headaches, anxiety, and depression roughly a month after her January 2022 vaccinations. Brandon Weiss Aff. at 3; Traci Weiss Aff. at 2; Traci Weiss Statement at 2. But not only were they prepared in connection with this case (a circumstance that is reasonably taken into account in assessing what weight to give them), but they wholly lack record corroboration. *See McCoy v. Sec'y of Health & Hum. Servs.*, No. 20-1321V, 2024 WL 5297985, at *12 (Fed. Cl. Oct. 15, 2024) (citing *Kirby,* 997 F.3d at 1383; *Cucuras*, 993 F.2d at 1528).

In effect, then, these witness statements merit limited weight, and cannot alone be the basis for a finding of onset, any more than claimants can prevail more generally in the Program on the basis of "'the claims of a petitioner alone, unsubstantiated by medical records or medical opinion.'" *Black v. Sec'y of Health & Hum. Servs.,* No. 21-09V, 2023 WL 4446500, at *4 (Fed. Cl. Spec. Mstr. May 22, 2023) (quoting Section 13(a)(1)(B)). While it can be determined that A.W. likely experienced symptoms from Graves' disease before her formal diagnosis, it is far more likely that she experienced these symptoms no sooner than in August 2022, when she fainted on a hike and was seen at Rady Children's Hospital Emergency Department, where her first symptom was documented in her medical record. *See* Ex. 7 at 18–20.

Is a timeframe of six months post-vaccination (or even one month) for onset of alleged vaccine-induced autoimmune thyroid disease medically acceptable? It is common in off-Table claims for experts to provide an opinion as to the medically-acceptable range for symptom onset after vaccination. *See, e.g., Bost v. Sec'y of Health & Hum. Servs*., No. 22-01V, 2026 WL 1068080, at *7 (Fed. Cl. Spec. Mstr. Mar. 18, 2026) (Petitioner's expert opining that CIDP onset eight days post vaccination was medically appropriate, given medical literature that placed development of autoimmune diseases after vaccination within at least 42 days); *Songero v. Sec'y of Health & Hum. Servs*., No. 18-300V, 2025 WL 3013090, at *18 (Fed. Cl. Spec. Mstr. Oct. 3, 2025) (range of 1 to 63 days proposed for an influenza vaccine to cause transverse myelitis). While there may not be bright-line rules for the relevant timeframe, a claimant must offer some evidence that onset "fits" the timeframe that is inherent to their causation theory—that the disease process first manifested

in a reasonable time post-vaccination. *Paluck v. Sec'y of Health & Hum. Servs*., 786 F.3d 1373, 1383–85 (Fed. Cir. 2015).[14]

Dr. Berger, however, has failed to substantiate a timeframe for vaccine-induced Graves' disease. His causation theory proposes that the increased stimulation of A.W.'s immune system after her vaccinations (combined with her genetic predisposition to autoimmune thyroid dysfunction) likely triggered an autoimmune response of multiple cell-types in different organs—causing her thyroid disease as well as exacerbating her vitiligo (conditions he credibly proposed are related). *See* First Berger Rep. at 9–10. But Dr. Berger did not provide any independent corroborative substantiation for the relevant timeframe in which this autoimmune process would occur. At most, he seems to *assume* it could occur within a month of the January 2022 vaccinations (based in part on the unsubstantiated assumption that A.W.'s receipt of multiple vaccines in a four-month period—end of August 2021 to early January 2022—was dangerous from an immune perspective).

But the medical literature does not support even that short a timeframe. The NASEM Report discusses COVID-19 vaccines, and does not discuss vitiligo or autoimmune hyperthyroidism. *See* NASEM Rep. Michaels & Eisenbarth described the pathogenesis, diagnosis, and treatment for Graves' disease and Hashimoto's Thyroiditis, but does not mention vaccines as triggers. Michaels & Eisenbarth at S231–33. Forssberg is a 10-year retrospective analysis of children's medical records to find incidence of childhood thyrotoxicosis. Forssberg at 25. It discusses symptoms, comorbidities, and the months between symptoms onset and diagnosis, but does not describe developmental timeframes from triggering events. *See generally id.* And Pollack-Schreiber discussed the rise of Graves' disease during the COVID-19 Pandemic and theorized exposure to the SARS-CoV-2 virus or immunizations could stimulate an immune response that develops into an autoimmune disease, but did not come to the conclusion that the virus or vaccine caused hyperthyroidism, nor did it discuss what would be an appropriate vaccine-associated onset timeframe. *See generally* Pollack-Schreiber.[15]

Thus, Petitioner has not preponderantly shown that A.W.'s Graves' disease likely began in February 2022, with the record better supporting onset in the August-October 2022 timeframe. And she has not established that an onset of six months, or even one-month post vaccination, would be medically acceptable.

---

[14] A timeframe that was inordinately long—say a year or more—would almost be facially disqualifying.

[15] At most, Singhal & Gupta (which discusses hyperthyroidism and the COVID-19 vaccine) makes references to how the Hep B vaccine, HPV vaccine, and influenza vaccine have been reported to be related to autoimmune thyroid disease. Singhal & Gupta at 526.

## II. A.W.'s Vitiligo

A.W.'s vitiligo diagnosis is not contested, and the record best supports the conclusion that it likely developed *before* her January 2022 vaccinations—if not before *any* of the vaccinations at issue. Thus, on August 2, 2022, Petitioner reporting white spots around A.W.'s face for the past two years (or since 2020). Ex. 4 at 13–14. Weeks later, Petitioner told medical providers that A.W. had skin discoloration "for a few year[s]." Ex. 7 at 18. This is also something that Dr. Berger has arguably conceded. Second Berger Rep. at 1 (discussing the pre-vaccination "spot around [A.W.'s] mouth).[16]

Thus, it fell to Petitioner to preponderantly establish that A.W.'s alleged vaccine-induced exacerbation occurred in a medically-acceptable timeframe. Petitioner argues that exacerbation occurred within a month of the January 2022 vaccinations. Again, however, she relies almost exclusively upon uncorroborated witness statements. Thus, A.W.'s grandmother stated that she first noted depigmentation on A.W.'s mouth and knees on February 23, 2022, at A.W.'s birthday party. Lori West Aff. at 1–2. In Mr. Weiss's affidavit, he claims that he first noticed depigmentation in A.W. during the weekend of February 3rd, 2022, on a daddy-daughter ski weekend. Brandon Weiss Aff. at 2. Petitioner's own affidavit also places the development of A.W.'s vitiligo in February 2022. Traci Weiss Aff. at 2–3. (And the reliability of some of these witness statements is also slightly called into question, to the extent they claim symptoms were never observed before the winter of 2022—despite subsequent medical records supporting the conclusion that A.W.'s vitiligo had existed *long before* vaccination. *See generally* Traci Weiss Aff. at 2; Brandon Weiss Aff. at 2; Lori West Aff. at 1).

By contrast, the medical record does not evince development or growth of A.W.'s likely-preexisting vitiligo until August 2022. The first medically documented observation of A.W.'s pigment discoloration/vitiligo occurred on August 2, 2022, when A.W. was seen by Dr. Gandhi for skin discoloration and it was noted that A.W. had "hypopigmentation" around her mouth and on her knees. Ex. 7 at 18–20. A.W.'s prior medical encounter from July 27, 2022, did not mention hypopigmentation. Ex. 4 at 8–12. Indeed, the Physician's Assistant, Megan Buse, noted that A.W. was negative for skin conditions (rash, acne, dry skin), and did not note any depigmentation upon exam. *Id.*

The overall record thus supports a date for onset of vitiligo exacerbation of no sooner than the late summer of 2022—six months or more after A.W. received her final vaccines at issue, in early January 2022. This timeframe has not been demonstrated by Dr. Berger to be medically acceptable, with no independent evidence filed in this case that would suggest exacerbation of

---

[16] Dr. Berger tried to salvage a causation-in-fact claim for A.W.'s vitiligo by offering alternative diagnoses for the pre-vaccination white spot reported by Petitioner. Second Berger Rep. at 1. But this diagnosis was not corroborated by other medical providers, including dermatologist Dr. Shirazi, who first assessed and diagnosed A.W. with vitiligo. *See* Ex. 5 at 3.

vitiligo (assuming it could be worsened by a vaccine) would unfold so slowly for a process proposed to be immune-mediated. As a result, the sixth *Loving* prong is not preponderantly established, and this aspect of Petitioner's claim also fails.

## CONCLUSION

Because Petitioner did not carry her preponderant burden of showing that A.W.'s alleged injuries likely began in a medically acceptable timeframe, measured from vaccination, she is not entitled to compensation.

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court **SHALL ENTER JUDGMENT** in accordance with the terms of this Decision.[17]

**IT IS SO ORDERED**.

/s/ Brian H. Corcoran
Brian H. Corcoran
Chief Special Master

[17] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment if (jointly or separately) they file notices renouncing their right to seek review.